UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DEC 11 2019 PM 2:04
FILED-USDC-CT-NEW HAVEN

GRAND JURY N-19-2

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 3:19CR 305 (VLB) |
| v. | VIOLATION:<br>18 U.S.C. § 1343 (Wire Fraud) |
| ANTHONY TEIXEIRA | |

INDICTMENT

The Grand Jury charges:

COUNTS ONE THROUGH TEN
(Wire Fraud)

General Allegations

At all times relevant to this Indictment:

1. Defendant ANTHONY TEIXEIRA ("TEIXEIRA") resided in Danbury, Connecticut. For at least 25 years, ending in or about February 2019, TEIXEIRA worked for Joseph Merritt & Company ("JMC"), a company headquartered in Hartford, Connecticut.

2. TEIXEIRA was a senior executive for JMC and oversaw the JMC branch located in Danbury, Connecticut.

3. JMC both provided printing services and sold printing-related items to its customers.

4. TEIXEIRA and his wife maintained an account at Bank of America.

JMC's General Billing Practices

5. When a customer solicited JMC either for printing services or to purchase printing-related items, JMC generally generated a sales order with a unique sales order number ("SO Number") that described the work to be performed and/or items to be sold. JMC could also

generate a "test" sales order to provide a customer with a price quote, which also generated an SO Number.

6. After completion of the print production or upon sale of the printing-related item, JMC generated an invoice that referenced the SO Number contained in the open sales order or test sales order. In doing so, the invoice "closed out" the sales order or the test sales order in JMC's internal systems. A sales order and/or test sales order could only be "closed out" through the generation of an invoice that referenced its SO Number.

7. An invoice also contained specific codes that identified work performed or items sold for internal tracking purposes. With respect to the sale of printing-related items, the inclusion of this code was the mechanism by which JMC tracked its inventory of printing-related items it had for sale.

8. The sales orders, test sales orders, and invoices had descriptive fields that could be changed in JMC's internal systems, but the unique SO Number could not be altered once generated.

## Online Billing Platforms

9. ProPay Inc. ("ProPay") is a company that provides payment processing solutions to businesses and individuals. Its services include, amongst others, mobile payment options that allow a business or individual to process payments through a mobile device.

10. Square Capital, LLC ("Square") is also a company that provides payment processing solutions to businesses and individuals. Like ProPay, its services include, amongst others, mobile payment options that allow a business or individual to process payments through a mobile device.

11. At all times relevant to this Indictment, TEIXEIRA maintained accounts with ProPay and Square.

## The Wire Fraud Scheme

12. Beginning in or about January 2012 and continuing through in or about February 2019, the precise dates being unknown to the Grand Jury, in the District of Connecticut and elsewhere, the defendant TEIXEIRA, knowingly and with intent to defraud, devised and intended to devise, and participated in, a scheme and artifice to defraud and obtain money and property from JMC and its customers, by means of materially false and fraudulent pretenses, representations, and promises, and in furtherance of that scheme used and caused to be used interstate wires.

13. The purpose of the wire fraud scheme was for TEIXEIRA to enrich himself by exploiting the JMC invoicing and inventory systems and thereby stealing JMC's money and property, specifically by:

   a. falsely representing to JMC and JMC's customers that the payments JMC's customers made for print productions completed by JMC would be remitted to JMC, when, in fact, TEIXEIRA planned to and did divert the payments to himself; and

   b. falsely representing to JMC that JMC had sold certain inventory to customers, when, in fact, Teixeira (STP) stole that inventory and sold it online.

## Manner and Means of the Wire Fraud Scheme

14. The manner and means by which TEIXEIRA sought to accomplish and did accomplish the objects of the wire fraud scheme included, among others, the following:

15. It was part of the scheme that TEIXEIRA served as a high-level executive within JMC and had access to its invoice and billing systems.

3

16. It was part of the scheme that TEIXEIRA, as a high-level JMC executive, understood how the inventory and billing systems worked and the functions they served, including the tracking of inventory.

*TEIXEIRA Stole Money From Print Productions*

17. It was part of the scheme that when a customer solicited a print production from JMC, TEIXEIRA generated a test sales order (that is, a price quote) or sales order for work to be performed.

18. It was a part of the scheme that TEIXEIRA directed employees at JMC to complete the print production, or that he completed the print production himself.

19. It was part of the scheme that, instead of then generating an invoice to present to the customer for payment, TEIXEIRA printed and presented the test sales order or sales order to the customer as though it was an invoice, when, in fact, he had not generated an invoice.

20. It was part of the scheme that TEIXEIRA had customers unknowingly remit payment on the test sales order or sales order into accounts controlled by TEIXEIRA that were unrelated to JMC. Specifically, TEIXEIRA had customers remit payment into his Square or ProPay accounts, while leading the customers to believe they were paying JMC.

21. It was part of the scheme that when a customer paid by check, TEIXEIRA deposited the check into his personal Bank of America account and sometimes altered the payee section of the check to do so.

22. It was part of the scheme that, to cover up his fraud, TEIXEIRA had to close out in JMC's computer system the SO Number generated by the test sales order or sales order on which he had diverted payment (the "stolen sales order").

23. It was part of the scheme that TEIXEIRA closed out the SO Number for the stolen sales order by creating a new sales order for another customer order at a later date and fraudulently using the same SO Number that had been assigned to the stolen sales order. When JMC then completed the new print production and invoiced that subsequent customer in the ordinary course, it closed out the SO Number and allowed TEIXEIRA to conceal his fraud.

*TEIXEIRA Stole Inventory*

24. It was part of the scheme that TEIXEIRA stole inventory from JMC and resold it online.

25. It was part of the scheme that when a customer requested a print production, TEIXEIRA generated a sales order and invoice for the print production.

26. It was part of the scheme that TEIXEIRA included the unique code associated with the inventory he planned to steal or stole on the sales order and invoice for the print production, but edited the description field associated with the unique code to describe the print job the customer requested.

27. It was part of the scheme that the customer, not knowing what the unique code signified and seeing the altered description, believed that they were paying for the print production.

28. It was a part of the scheme that TEIXEIRA directed employees at JMC to complete the print production, or that he completed the print production himself.

29. It was part of the scheme that by including the unique code associated with the inventory he planned to steal or stole on the sales order and invoice, it relieved the stolen inventory in JMC's system, thereby allowing TEIXEIRA to steal the product without JMC detecting an inventory delinquency.

30. It was part of the scheme that once TEIXEIRA stole the inventory, he sold the inventory on eBay and received payment through one of three accounts he controlled on PayPal.

31. It was part of the scheme that TEIXEIRA's actions exposed JMC to a risk of loss and caused actual losses.

Executions of the Scheme

32. On or about the dates set forth in each count below, in the District of Connecticut and elsewhere, TEIXEIRA, for the purpose of executing and attempting to execute the aforementioned scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises as described above, did knowingly transmit and caused to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals and sounds, each wiring as set forth below each constituting a separate count of this Indictment:

| Count | Date | Description of Use of Interstate Wires |
|---|---|---|
| 1 | 6/9/17 | A customer payment remitted to TEIXEIRA's Square account in the amount of $4,079.87. |
| 2 | 11/14/17 | A customer payment remitted to TEIXEIRA's ProPay account in the amount of $132.66. |
| 3 | 1/17/18 | A customer payment remitted to TEIXEIRA's Square account in the amount of $4,402.89. |
| 4 | 2/19/18 | A customer payment to TEIXEIRA's PayPal account ending with the numbers 7312 in the amount of $358.95 sent from a customer in Florida purchasing a Cannon PF-04 Printhead. |
| 5 | 5/21/18 | A customer payment remitted to TEIXEIRA's Square account in the amount of $514.46. |
| 6 | 6/13/18 | A customer payment remitted to TEIXEIRA's Square account in the amount of $5,272.01. |
| 7 | 12/6/18 | A customer payment remitted to TEIXEIRA's ProPay account in the amount of $499.47. |

| Count | Date | Description of Use of Interstate Wires |
|---|---|---|
| 8 | 12/10/18 | A customer payment remitted to TEIXEIRA's ProPay account in the amount of $483.36. |
| 9 | 1/24/19 | A customer payment to TEIXEIRA's PayPal account ending with the numbers 7153 in the amount of $300.00 sent from a customer in South Carolina purchasing a Cannon PF-03 Printhead. |
| 10 | 2/4/19 | A customer check deposited via mobile deposit into TEIXEIRA's Bank of America account ending with the numbers 5367. |

All in violation of Title 18, United States Code, Section 1343.

A TRUE BILL

/s/
FOREPERSON

UNITED STATES OF AMERICA

*[signature]*
LEONARD C. BOYLE
FIRST ASSISTANT UNITED STATES ATTORNEY

*[signature]*
JOHN T. PIERPONT, JR.
ASSISTANT U.S. ATTORNEY